The PEOPLE of the State of Colorado, Complainant,

v.

Raymond Jacob MILLER, Attorney–Respondent.

No. 96SA60.

Supreme Court of Colorado, En Banc.

March 18, 1996.

Linda Donnelly, Disciplinary Counsel, Kenneth B. Pennywell, Assistant Disciplinary Counsel, Denver, for Complainant.

James F. Donaldson, Denver, for Attorney–Respondent.

PER CURIAM.

The respondent in this lawyer discipline proceeding entered into a stipulation, agreement and conditional admission of misconduct with the assistant disciplinary counsel. C.R.C.P. 241.18. The conditional admission recommended that the respondent be suspended from the practice of law in a range from ninety days to one year and one day. An inquiry panel of the supreme court grievance committee approved the conditional admission, and recommended suspension for one year and one day. We accept the conditional admission and the panel's recommendation.

I

The respondent was admitted to practice law in Colorado in 1976. The conditional admission contains two counts, and the parties stipulated to the following facts and disciplinary violations.

A. The New Mexico Racetrack

Jane Ann Hebert moved to Colorado from Louisiana with $400,000 in life insurance proceeds following her husband's death. Hebert met Tony Ciocchetti, a business promoter and entrepreneur who persuaded her to invest in the acquisition of a New Mexico track license. San Juan Downs Corporation was established for this acquisition. Hebert believed that she was the 100 percent shareholder, although Ciocchetti later asserted that he held 51 percent of the San Juan shares.

In order to demonstrate to the New Mexico Racing Commission that ample funds were available to develop the racetrack, the respondent arranged a loan prior to the racing commission hearing scheduled for March 19, 1992. The loan to Hebert was made by a physician who was a long-time client of the

24

respondent. The physician deposited $239,-500 into an account in Hebert's and the respondent's names. The respondent was a required signatory. The physician received a fee of $14,416 for the loan, and the funds remained in Hebert's account for three weeks. The racing commission denied the license to San Juan Downs Corporation and the money was transferred back to the physician. According to Hebert and the physician, the respondent failed to disclose to them that his professional judgment was likely to be adversely affected by his representation of both parties.

The respondent also arranged two other loans from the physician to Hebert, and prepared the promissory notes for both loans. The first note dated March 17, 1992, shows a loan of $14,925 with an interest rate of 12 percent. The principal was due March 31, 1992, and the note includes a default interest rate of 36 percent. The second note, dated June 12, 1992, is for $9,000, payable on August 11, 1992. The note shows an interest rate of zero percent with a default interest rate of 24 percent. According to the physician and Hebert, the respondent failed to disclose the parties' differing interests fully at the time the respondent suggested the loans to them.

The respondent admitted that the foregoing conduct violated DR 5–105(A) (a lawyer shall decline proffered employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be affected by the acceptance of the proffered employment, or which would be likely to involve the lawyer in representing differing interests, unless it is obvious the lawyer can represent the interests of each client, and both clients consent after full disclosure); and DR 5–105(B) (a lawyer shall not continue multiple employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be adversely affected by the lawyer's representation of another client, or if it would be likely to involve the lawyer in

representing different interests, except to the extent permitted by DR 5–105(C)).[1]

## B. Accidental Oil

In July or early August, 1991, Hebert and Ciocchetti became interested in purchasing an interest in Accidental Oil, an oil company which had filed for bankruptcy in Wyoming. The purchase was to be made through Intercircle Corporation, a company in which Ciocchetti was a principal. A term of the deal was that Intercircle was to escrow $45,000 in earnest money.

Hebert gave $45,000 in cash to Ciocchetti along with a $5,000 check dated August 28, 1991. She believed that the cash constituted the earnest money for the oil company deal and that Ciocchetti had delivered the $45,000 to the respondent. Ciocchetti states that Hebert's $45,000 never went to the respondent. Instead, Ciocchetti says that the entire $45,000 was expended on expenses used in furtherance of the attempt to acquire the oil company.

The physician says that the respondent approached him about loaning Intercircle Corporation $45,000 to invest in purchasing the oil company. Because the physician did not have liquid funds in the amount of $45,000 available to lend, the respondent, through the Miller family trust, loaned the physician the $45,000 that was then given to Intercircle Corporation for earnest money in purchasing the oil company. The respondent is the settlor and the trustee of the Miller family trust.

Hebert thought that her $5,000 check was for a service fee. The payee line on the check was left blank. The copy of the check that Ciocchetti gave to Hebert indicated that it had been made payable to the respondent. According to Ciocchetti, he copied the check while the payee line was still blank then filled in the respondent's name on the copy he gave to Hebert. The actual check was made payable to the physician as a loan fee.

On August 28, 1991, the physician endorsed the $45,000 family trust check and

1. The assistant disciplinary counsel has stipulated that the remaining charges under Count I of the formal complaint, involving violations of DR 1–102(A)(4), DR 1–102(A)(6), DR 7– 104(A)(1), DR 7–105(A), and DR 9–102(B)(4), cannot be proven by clear and convincing evidence, and recommended their dismissal as part of the conditional admission.

Hebert's $5,000 check, and gave them to the respondent who deposited both checks in his lawyer trust account the same day. This $45,000 was actually used to support Intercircle Corporation's bid to acquire the oil company. Intercircle's bid was denied and the funds remained in the respondent's trust account until September 12, 1991, when the entire $50,000 was transferred to the family trust account. The account records indicate that Hebert's $5,000 remained in the account.

According to Hebert, the respondent never advised her of this series of events and never advised her of the conflict between his personal interests and hers when he decided to loan the physician the $45,000 from his family trust. The respondent acknowledges that he failed to disclose to Hebert that he had loaned the money from his family trust to the physician to invest in the Accidental Oil deal.

In February 1992, the respondent also arranged a loan to Hebert from another of his clients, evidenced by a February 4, 1992, promissory note in the amount of $33,000 with an interest rate of 24 percent. The note was secured by a second mortgage on Hebert's home. The closing instructions show a loan discount fee of $1,200 and loan brokerage fee of $1,800, both of which were retained by the lender. In addition, $1,750 from the loan proceeds was paid directly to the respondent. The lender and Hebert assert that the $1,750 was paid to the respondent as an attorney fee. The respondent indicates that the $1,750 was for past attorney fees incurred by San Juan Downs Corporation and Hebert. Both the lender and the respondent agree that the respondent was not representing the lender with respect to this matter or any other matter at the time of the loan.

The respondent admits that he improperly entered into the Accidental Oil loan transaction without advising Hebert of the conflict between his personal interests and her interests. This admitted conduct violated DR 5–104(A) (a lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise the lawyer's professional judgment therein for the protec-

tion of the client, unless the client has consented after full disclosure).

In addition, respondent failed to explain to Hebert fully that his representation of her in the $33,000 loan might be affected by his prior representation of the lender in other matters. The conditional admission states that the foregoing conduct violated DR 5–105(A) (a lawyer shall decline proffered employment if the exercise of the lawyer's independent professional judgment in behalf of a client will be or is likely to be affected by the acceptance of the proffered employment, or which would be likely to involve the lawyer in representing differing interests, unless it is obvious the lawyer can represent the interests of each client, and both clients consent after full disclosure).

C. The Blue and the Tan Ford Explorers

In April 1991, Ciocchetti, on behalf of High Plateau (a business entity in which Ciocchetti, his mother, and Hebert were partners), arranged to lease a 1991 tan Ford Explorer from a Ford dealership that then assigned the lease contract to Ford Motor Credit Company. Hebert signed the lease contract on behalf of High Plateau as its managing director.

When High Plateau became delinquent on its lease payments, Ford Motor Credit Company sent a demand notice on March 2, 1992. About March 12, 1992, Ciocchetti and the respondent went to the Ford dealership with the tan Explorer to have repairs performed. While there, Ciocchetti, on behalf of San Juan Downs Corporation, negotiated a lease of a *blue* Explorer. With respect to the blue Explorer, the respondent charged $500 on his credit card as a down payment and signed various documents as the attorney for San Juan Downs Corporation. The purchase price of the blue Explorer was $26,916.

Meanwhile, the respondent decided to purchase the *tan* Explorer that the lease payments were in arrears on, and wrote a $14,200 check drawn on the Miller family trust to the Ford dealership. It was agreed between the parties that representatives of the Ford dealership would take the steps necessary to obtain a final payoff amount so that the respondent could acquire the vehicle title

then held by Ford Motor Credit Company. The respondent left the dealership in the tan Explorer and Ciocchetti left in the blue Explorer.

Hebert went to the dealership one or two days later and signed the necessary documents to lease the blue Explorer. She signed as President of San Juan Downs Corporation, and, later, in her individual capacity. All parties agree that the respondent did not advise or suggest that Hebert sign to purchase or lease the blue Explorer personally.

Then, on March 27, 1992, Ciocchetti went to the Ford dealership and was successful in having the dealership refund the entire amount of the respondent's $14,200 partial payment on the tan Explorer to him. Ciocchetti then negotiated the refund check. Ciocchetti's actions in obtaining the refund were done without the respondent's knowledge or permission. The respondent has not received any part of the $14,200.

Ford Motor Credit Corporation filed an action on or about August 13, 1992, against High Plateau, Hebert, Ciocchetti, and Ciocchetti's mother for replevin of the *tan* Explorer, based on the non-payment of the lease payments. The tan Explorer was being driven by the respondent's wife, while Ciocchetti had the blue vehicle outside Colorado. The respondent states that he was confused as to which Explorer was the subject of the replevin action since he believed that his $14,200 partial payment had been used to satisfy the arrearage in the lease payments. He mistakenly thought that the replevin action sought to recover the *blue* Explorer.

On August 27, 1992, the respondent, ostensibly on behalf of all four defendants, executed a stipulated entry of order of possession of the tan Explorer, which was made the order of the court the same day. Hebert, one of the defendants, did not authorize the stipulation and only became aware of it after the fact. According to the respondent, he did not disclose to any of the defendants,

except possibly Ciocchetti's mother, that there might be a conflict of interest before he executed the stipulation.

Although he executed the stipulation for possession on August 27, 1992, he did not relinquish possession of the tan Explorer. On or about October 30, 1992, Ford Motor Credit Corporation filed a motion for a writ of assistance asking the county sheriff to execute an order of repossession. The court granted the motion on November 2, 1992, and the respondent surrendered the vehicle four days later.

The respondent has admitted that entering into the stipulation for possession without making full disclosure violated DR 5–106(A) (a lawyer representing more than one client shall not make an aggregate settling of the claims of or against the lawyer's clients unless each client has consented to the settlement after full disclosure). Further, he violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) because submitting the stipulation to the court created the implicit misrepresentation that he had the authority to enter into the stipulation. By entering into the stipulation and then failing to return the tan Explorer in a timely manner, the respondent violated DR 1–102(A)(5) (a lawyer shall not engage in conduct prejudicial to the administration of justice), and DR 7–106(A) (a lawyer shall not disregard a ruling of a tribunal made in the course of a proceeding).[2]

## II

■ The inquiry panel approved the conditional admission, recommending that the respondent be suspended for one year and one day. Under the ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992), and in the absence of mitigating circumstances, disbarment is appropriate when, without the informed consent of the clients, the lawyer:

2. The assistant disciplinary counsel has stipulated that the remaining charges contained in Count II of the formal complaint, involving additional violations of DR 1–102(A)(4), cannot be established by clear and convincing evidence and recommends that they be dismissed as part of the conditional admission.

(a) engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client; or

(b) simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client....

*Id.* at 4.31. *See People v. Schindelar,* 845 P.2d 1146 (Colo.1993) (lawyer disbarred who entered into prohibited loan transaction with client and who failed to disclose the inherent conflicts of interest involved and did not supply client with appropriate legal documents to ensure repayment of loan or disclose inadequacy of security for loan). On the other hand, "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." *Id.* at 4.32. *See People v. Lopez,* 796 P.2d 957 (Colo.1990) (representation of client when there was an obvious conflict of interest with client's business interest and the making of misrepresentation in applications for liquor licenses warrant six-month suspension from practice of law).

The respondent's failure to disclose the obvious conflicts of interest in this case between Hebert and the respondent's other clients, and between Hebert and the respondent himself, caused Hebert substantial harm. The assistant disciplinary counsel is not recommending restitution as part of the conditional admission because of the civil settlement reached between Hebert and the respondent's professional malpractice carrier for $75,000.

The sole factor in mitigation is that the respondent has no prior disciplinary record. ABA *Standards* at 9.32(a). The multiple offenses are an aggravating factor, *id.* at 9.22(d); as is the existence of a pattern of misconduct, *id.* at 9.22(c). Taking the seriousness of the misconduct together with the factors in aggravation, we conclude that suspension for one year and one day is an appropriate disciplinary sanction. Accord-

ingly, we accept the conditional admission and the inquiry panel's recommendation.

### III

It is hereby ordered that Raymond Jacob Miller be suspended from the practice of law for one year and one day, effective thirty days after the issuance of this opinion. *See* C.R.C.P. 241.21(a). It is also ordered that the respondent pay the costs of this proceeding in the amount of $212.93 within thirty days after the announcement of this opinion by the Supreme Court.